OTIS GARDNER AND JEROME VERDELL MAPLE, A/K/A JAMES VERDELL MAPLE *v.*
STATE OF MARYLAND

[No. 295, September Term, 1968.]

*Decided April 8, 1969.*

*Michael Lee Kaplan* (*Morris Lee Kaplan* on the brief) for appellants.

*John J. Garrity, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Julian B. Stevens, Jr., State's Attorney for Anne Arundel County,* and *Ronald M. Naditch, Assistant State's Attorney for Anne Arundel County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

Otis Gardner and Jerome Verdell Maple, also known as James Verdell Maple, appeal from the judgments rendered against them at a court trial in the Circuit Court for Anne Arundel County. Each was convicted of storehousebreaking with intent feloniously to steal and each was sentenced to 4 years, Gardner's sentence to run consecutively with any sentence he was then serving.[1] Maple contends that the trial court erred in denying a motion to suppress evidence, claiming that the evidence was obtained by a search and seizure unreasonable as incident to an illegal arrest. Each contends that the evidence was not sufficient to sustain his conviction.

## THE MOTION TO SUPPRESS

We hold that the court did not err in denying the motion. Evidence adduced on the motion showed that the premises 1810

---

1. Thomas Edward Clark, Russell Taylor and Jasper Lee Roy were jointly indicted with the appellants. Clark and Taylor were tried with the appellants and found not guilty. At the time of trial it appeared that Roy was incarcerated in Richmond, Virginia and was not then available for trial.

North Brunt Street in Baltimore City was a residential dwelling in which no commercial enterprise was conducted nor were there any commercial establishments on Brunt Street. A small alley ran between the rear of the premises in the 1800 block of Brunt Street and the rear of buildings facing on the 1800 block of Pennsylvania Avenue. The buildings facing on Pennsylvania Avenue, running upward from 1801 Pennsylvania Avenue were a Thom McAn's store (a shoe store), a food market, a large shoe store, a small store "used primarily where workers meet in the morning who pave streets," a liquor store, a pool hall and a fashion shop.[2] "[T]he people that have these stores cement all their rear windows and doors up." Shortly before 6:30 A.M. on 9 August 1967 "The Western District" received information "that some men were unloading some stereos and hi-fi's and televisions from a U-Haul It truck in the rear of 1800 block North Brunt Street."[3] A lieuteneant, a sergeant and three officers went to the rear of 1810 Brunt Street, arriving about 6:30 A.M.[4] They saw a U-Haul It truck, a 1967 Ford, bearing Oregon license tags T 256684 parked in the alley—"almost the whole alley was completely taken up by the width of the truck." There was a door in the rear of 1810 Brunt Street from a kitchenette, then there was "about 25 feet * * * of yard to the alley." The truck was parked so that the tailgate was opposite the yard. "[I]f you stepped right off the truck you could * * * walk straight 25 feet (through the yard) and be right in the house." The rear doors of the truck were open. Inside the police saw television sets, radios, stereos, consoles and appliances "brand new." No one was in the truck. The rear door of 1810 Brunt Street was open. Two officers were dispatched to the front of the premises. The lieutenant, the sergeant and an officer went to the rear door. The police could look into the

---

2. This testimony was by a member of the police team who arrested Maple. The officer had been assigned to the neighborhood for eight years.

3. It appeared that the "information" was received by Lt. Judd by telephone. The record does not disclose who the caller was. Defense counsel referred to the call at one point as "this anonymous telephone call."

4. Apparently another sergeant arrived shortly thereafter.

kitchenette and "all the way into the dining room." They saw "a good ten or fifteen" new appliances in the kitchenette and dining room. There were three or four television sets, and radios, stereos, consoles (which they could not determine at the time contained stereos or television sets) and clock radios. "They weren't arranged for a showroom, that's for sure. They were piled on top of one another." The police announced themselves as police, "identifying ourselves as same." When they did this they heard "several voices hollering police, police, the police are here * * * We heard the front door being opened and shut and we heard men running back into the dinning room, I assume, where the hallway is, running up the steps to the second floor, we heard a window in the rear, in the rear of 1810 Brunt Street being opened." When cries of "police" were heard the lieutenant and the sergeant went "one or two steps" into the house. When they heard the men run up the steps and the window being opened they stepped back into the yard and observed three men coming out of the second floor window which opened on a roof. The men ran across the roof to 1812 Brunt Street. The police called for them to stop. "They stopped and came down" and were apprehended. As one of the officers who had been dispatched to the front of the premises was standing in front of the house, he heard "a lot of screaming 'Police' and a lot of running coming from in the house." The front door opened. "[T]here were some people there and they tried to get out and it closed right fast, I couldn't identify exactly who it was, who tried to get out when they saw me, I was in uniform." He received word that people were arrested in the back and went to the rear of the house. He entered the rear door and while inside heard some more movement coming from the second floor. He went to the second floor and found a man in the bathroom behind a closed door. He arrested him. Two of the men who climbed out the window were Maple and Clark and were identified at the trial by the sergeant. The other man was Roy. The man apprehended in the bathroom was Taylor. "On information received" a warrant was obtained for the arrest of Gardner and he was subsequently arrested under its authority.

Maple contends that his arrest was illegal on three grounds: (1) it was not shown that the information received by the police

as to men unloading the goods from the truck came from a reliable informer; (2) the arresting police did not have probable cause to believe that a felony had been committed and that he had committed it nor did they have probable cause to believe that a misdemeanor had been or was being committed in their presence or view and that he was the misdemeanant; (3) the arrest was the result of a trespass by the arresting officers.

## (1)

The appellant in support of his first ground relies on the rule stated in *Hundley v. State,* 3 Md. App. 402, 405, that information furnished to a law enforcement officer by an informer, together with the officer's personal knowledge, may serve as the basis of sufficient probable cause for a warrantless arrest if the trial court is informed with specificity what the informer actually said, and why the officer thought the information was credible, and the court is satisfied such information was sufficiently reliable and reasonably trustworthy to give the officer as a prudent man, probable cause to believe that the accused had committed or was committing an offense. We applied the rule in *Mullaney v. State,* 5 Md. App. 248. But the rule is not here applicable. The evidence as to the information received explained only why the police went to 1810 Brunt Street and is no more relevant in the circumstances to the determination of probable cause for the arrest than if the police had observed the truck by mere chance. The legality of the arrest of Maple is determinative by what the officers did and had reason to believe by what they properly saw and heard when they arrived on the scene, not why they were there. For the purpose of decision here the "information received" does not serve in any way as basis of sufficient probable cause and is given no probative value with respect thereto. As we approach the issue of the legality of the arrest it plays no part in our consideration.[5]

## (2)

The rules with respect to the legality of a warrantless arrest by police officers for felonies and misdemeanors are firmly es-

---

5. We note, however, that there may be a distinction between an "informer" as that term is usually used in enforcement activities and an "informant" but we need not pursue the distinction here.

tablished in this State and have been stated and restated in opinions of this Court and the Court of Appeals. See *Simms v. State,* 4 Md. App. 160, 166-167. The rules as stated are clear but may at times be difficult to apply, not only because of the infinite variety of factual circumstances surrounding an arrest, but because an integral element of the rules is the phrase "probable cause." "The rule of probable cause is a non-technical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction, but more evidence than that which would arouse a mere suspicion." *Edwardsen v. State,* 243 Md. 131, 136; *Terrell v. State,* 3 Md. App. 340, 359.

In the instant case, however, we have no difficulty in determining that there was probable cause for the arresting officers to believe that a felony had been committed and that Maple was one of those who had committed it. The time of day when they saw the truck; their observance through the open doors of the truck that it was loaded with new major appliances; the location of the truck immediately adjacent to the rear of 1810 Brunt Street; that the even 1800 block Brunt Street consisted only of residential dwellings; that the buildings on Pennsylvania Avenue, the rears of which were on the alley contained no commercial establishments dealing with the type of goods observed in the truck and that access to those establishments from the alley had been cemented up; that the rear door of 1810 Brunt Street was open; that they observed through the open door of that dwelling a number of new appliances of the type in the truck, stacked in the kitchenette and dining room, "piled on top of one another"; that when they announced their identity as police at the open door there were cries from within of "police, police, the police are here" immediately followed by the front door being opened and quickly shut and the sound of running footsteps to the second floor of the house and a window being opened; that they saw three men climb out the window and run across a roof to the next house; Maple was one of these men. From the totality of these circumstances the arresting officers were in a situation in which they had probable cause to believe that the felony of grand larceny,[6] Md. Code,

---

6. Asportation of stolen goods is an element of larceny, *Clark*

Art. 27, § 340, or the felony of receiving stolen goods of the value of $100 or upwards, Md. Code, Art. 27, § 466, had been committed, the nature of the goods permitting the rational inference that their value was $100 or more. And they had probable cause to believe that those fleeing were the thieves or the receivers. Their flight, particularly in light of the other circumstances, could reasonably be viewed as evidence of guilt of either of those particular crimes. *Salmon v. State,* 2 Md. App. 513, 522-523.

## (3)

There is no question that the actions of the police up to the point they entered the yard and proceeded to the open rear door were proper. And the evidence clearly shows that the door was open and that they were able to see the goods inside the house without further opening the door. These observations, in themselves, were not improper. See *Minnick v. State,* 4 Md. App. 81; *Johnson v. State,* 2 Md. App. 300. But we think that it was not until the observations and ocurrences after the officers were in a position to see into the house through the open rear door, that they had probable cause for the arrest. It was these observations and occurrences coupled with what went before, that established sufficient probable cause. Therefore the question is whether the police were illegally in the yard at the time they looked in the open door of the house.

The cases in this State pertaining to the question hold that where the facts establishing probable cause were obtained while the officers were illegally on the premises, the arrest would not support the introduction of evidence but if they were legally on the premises, the arrest would support the introduction of evidence.[7] Although the cases cited in note 7, *infra,* clearly estab-

---

*and Marshall, Law of Crimes,* (6th Ed.) § 12.05, pp. 736-741. Every asportation is a new taking. *Worthington v. State,* 58 Md. 403, 409.

7. For cases holding the police were trespassers see: *Beale v. State,* 230 Md. 182; *Gorman v. State,* 161 Md. 700; *Turner v. State,* 195 Md. 288; *Wanzer v. State,* 202 Md. 601; *Gault v. State,* 231 Md. 78; *Dailey v. State,* 234 Md. 325; *Dorsey and Gladden v. State,* 2 Md. App. 40; *Brown v. State,* 3 Md. App. 90. For cases holding the police were not trespassers see: *Harris v. State,* 203 Md. 165 (passageway used by other tenants); *Eisenstein v. State,* 200 Md.

lish the general rule, we find none so factually apposite as to be dispositive of the instant case.

Under the circumstances of this case, it was not a trespass for the officers to go upon the premises as in the line of their duty.[8] See *Heinz v. Murphy,* 180 Md. 423, 433. In *Davis v. State,* 236 Md. 389, the Court of Appeals recognized the general rule that a search of private premises should be pursuant to a legally issued warrant. But it said, at 395: "However, the courts recognize exceptions to this general rule, one of which is an entry made during an emergency situation." There the police found a dead person in the defendant's back yard under circumstances commanding that they determine whether more than one person had been victimized in the carnage which had taken place and the Court held the entrance into the house reasonable. "[I]t is clear that the police were acting in pursuance of their duty to investigate a reported death" at 395. After entry they became possessed of the degree of knowledge sufficient to warrant them in the reasonable belief that the defendant had committed the felony which caused the death of the man in the back yard. The court found that the arrest of the defendant and search of the house which followed were legal. Of course, we cannot say that the entry into the yard here by the police was such an emergency situation as existed in *Davis.* But we think it was well within exceptions to the general rule referred to by the Court therein. From the observations of the police with respect to the truck—its location, its contents, the nature of the neighborhood—and considering the time of day and the open rear door of 1810 Brunt Street, we believe they were perfectly entitled to enter the yard and go to the door of

---

593 (police in public hallway); *Griffin v. State,* 200 Md. 569 (peeking through window, apparently from a public street); *Bass v. State,* 182 Md. 496 (in ante-room of a lodge); *Silverstein v. State,* 176 Md. 533 (entered store by door open to public); *Franklin v. State,* 208 Md. 628 (public hallway); *Johnson v. State, supra,* (looking through a window with binoculars from a building occupied legally by the police); *Minnick v. State, supra,* (looking through crack in door from public alley).

8. When an officer has a warrant for the arrest of a person, it is not only his right to go to that person's home but his duty. *Hubbard v. State,* 195 Md. 103, 107; *Gault v. State,* 231 Md. 78, 81.

the house to make inquiry as to the truck. We think it was their duty to do so. They were not trespassers in so doing. Nor were they guilty of any impropriety in looking through the open rear door when they approached it. The goods they saw through the open door were lying freely exposed and they were not required to look the other way or disregard evidence their senses brought them. There was no intrusion of privacy nor did the observations through the door constitute a search. They properly identified themselves as police officers. Nothing they did, including walking a few steps into the house at the time they did so, constituted a trespass in the circumstances. See *Ellison v. United States,* 206 F. 2d 476 (D. C. cir.). On the facts of this case the conduct of the police did not fall within that area of official overreaching or "dirty business" which is the concern of courts when they exclude evidence obtained by an unwarranted intrusion upon the privacy of a residence. See *United States v. Horton,* 328 F. 2d 132 (3rd cir.). What came to their knowledge while at the door was legally obtained and this knowledge properly contributed to the establishment of probable cause to arrest Maple.

We hold that the arrest of Maple was legal, the subsequent entry into the house was not a trespass; the search and seizure of the challenged evidence was reasonable, and the evidence properly admissible. *Minnick v. State, supra,* at 84. Therefore the trial court did not err in denying the motion to suppress.[9]

## THE SUFFICIENCY OF THE EVIDENCE

The contentions of the appellants on this issue go only to their criminal agency and not to the *corpus delicti* of the crime of which they were convicted. The evidence fully established that the Severna Park Disc Shop had been broken and entered between the hours of 9:15 P.M., 8 August 1967 and 1:40 A.M.

9. We think it obvious that Md. Code, Art. 27, § 580 which makes it unlawful for any person "to enter upon the land or premises of another for the purpose of invading the privacy of the occupants of any building or enclosure located thereon, by looking into any window, door or other aperture of such building or enclosure," is here not applicable. And we have assumed for the purpose of decision, but do not decide, that the appellant had standing to object to the seizure of the evidence.

the next day. "Televisions, console televisions, portable televisions, console stereos, record players, tape recorders, miscellaneous radios, AM-FM conventional radios" were stolen. There were some 35 articles taken of a total value of $3728.57. Tire tracks at the scene showed that the thieves arrived in a truck with dual rear wheels and transported the stolen articles away in the truck. Footprints indicated that there were at least two participants. The goods found in the house at 1810 Brunt Street were identified by the owner of the Severna Park Disc Shop as those stolen from his store.[10]

The occupant of the premises 1810 Brunt Street was Shirley Boone, although there was evidence that a William Holt paid the rent, staying at the house "whenever he feels like it * * * off and on * * * about three times a week." She testified that in the early morning of 9 August she had been watching television and when it "went off" about 1:30 or 2:00 A.M. she went outside and "swept the steps off" and then went upstairs. After 2:00 A.M. (she at one point indicated it was about 2:30 A.M.) Maple and Roy, neither of whom lived there, came to the house and brought "televisions and record players in the house." [11] Gardner also came in the house carrying a record player. She knew each of them. They brought in all the goods later seized by the police. She did not know where they were getting them. She "didn't say nothing to them" and did not ask them where they got the goods. She had come downstairs when Maple and Roy first came to the house and let them in. She stayed downstairs about half an hour "because the baby woke up" and then went upstairs. Maple and Roy at that time were each asleep in a chair. Gardner had left the house and was not there when the police arrived. Taylor and Clark also came to the house but at the time she did not know they were there. She saw "one of

---

10. There was testimony that the goods in the truck when it was found by the police were "turned over (by the police) to a Mr. Mulett in Easton, Maryland that operates Omega Electronics, Incorporated."

11. Shirley Boone said she owned one television set which she was watching that night. It was located "right by the front room door." She also owned one stereo. Neither could be seen from the rear door.

them out in the backyard and the other one was coming from upstairs with the police."

The State produced evidence which showed that the truck in the alley had dual rear wheels. An expert witness testified that a latent fingerprint found on the outside top surface of the right door of the truck was that of Gardner and that a latent fingerprint found on one of the stolen clock radios was that of Maple.[12] There was also before the court on the substantive issue the presence of Maple in the house and his flight when the police identified themselves.

Applying the test stated in *Williams v. State,* 5 Md. App. 450, 459, we find that the evidence before the trial court was sufficient to sustain the convictions. It could properly find from the testimony of Shirley Boone that Maple and Gardner were in exclusive possession of recently stolen property, unexplained, permitting the rational inference that they were the ones who broke the storehouse. *Fisher v. State,* 5 Md. App. 155; *Reagan v. State,* 2 Md. App. 262, 268. See *Boswell and Poe v. State,* 5 Md. App. 571. That the intent of the breaking was feloniously to steal was conclusively shown by the value of the goods actually stolen. *Johnson v. State,* 5 Md. App. 540, 545. As to each there was also the fingerprint evidence and as to Maple, there was his presence at the house and his flight at the appearance of the police. On the evidence before it the court was not clearly wrong in its judgment that each appellant was a criminal agent in the crime charged. Md. Rule 1086. The trial court was under no obligation to believe the explanations or denials of the appellants. *Eley v. State,* 4 Md. App. 230; *Melia and Shelhorse v. State,* 5 Md. App. 354.

The appellants argue that Shirley Boone was an accomplice, that her testimony was not corroborated, that the uncorroborative testimony of an accomplice has no probative value and without her testimony the evidence was not sufficient.

We discussed the complicity of a witness in *Burley v. State,* 5 Md. App. 469, stating the definition of an accomplice. We said that the fact that a witness is an accomplice must be shown

---

12. The expert also said he made an identification that another latent fingerprint was that of Roy.

by proof, like any other fact, but the burden of proving that a witness is an accomplice by a preponderance of the evidence is on the defendant who asserts it, at 473. The appellants here did not meet this burden. The evidence was not sufficient to show that Shirley Boone was a principal in the crime or an accessory before the fact. And it reasonably explained the presence of the goods in her house. *Grimes v. State,* 4 Md. App. 607, 609-610. Further, we note that an accessory after the fact is not an accomplice. *Watson v. State,* 208 Md. 210, 220. Nor is a receiver of stolen goods an accomplice of a thief unless they conspire together in a pre-arranged plan for one to steal and deliver to the other and pursuant to such plan one does steal and deliver to the other. *Osborne v. State,* 4 Md. App. 57, cited in *Burley v. State, supra,* at 478. No such plan was here shown. We hold that Shirley Boone was not an accomplice.

*Judgments affirmed.*